# United States Court of Appeals
## For the First Circuit

Nos. 04-2552; 04-2553; 04-2630; 04-2636

M. DIANE KOKEN,
as Liquidator on behalf of
Reliance Insurance Co. (in liquidation),

Plaintiff, Appellant/Cross-Appellee,

v.

BLACK & VEATCH CONSTRUCTION, INC.,

Defendant, Appellant/Cross-Appellee;

AUBURN MANUFACTURING, INC.; INPRO, INC.,

Defendants, Appellees/Cross-Appellants;

PYRO SHIELD, INC.,

Defendant;

O'CONNOR CONSTRUCTORS, INC., d/b/a REDCO/O'CONNOR;
REDCO, INC., d/b/a REDCO/O'CONNOR

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. Gene Carter, Senior U.S. District Judge]

Before

Selya, Dyk[*], and Howard, Circuit Judges.

John E. O'Brien, Jr., with whom Anthony R. Zelle and

---

[*]Of the Federal Circuit, sitting by designation.

Robinson & Cole, LLP, were on brief, for appellant/cross-appellee M. Diane Koken.

A. Cyclone Covey, with whom Lee C. Davis and Griffin Cochrane & Marshall, P.C., were on brief, for appellant/cross-appellee Black & Veatch Construction, Inc.

Elizabeth A. Germani, with whom Tracy D. Hill and Germani & Riggle, LLC, were on brief, for appellee/cross-appellant Auburn Manufacturing, Inc.

Frederick J. Badger, Jr., with whom Richardson, Whitman, Large & Badger was on brief, for appellee O'Connor Constructors, Inc.

Theodore H. Kirchner, with whom Norman, Hanson & Detroy, LLC, was on brief, for appellee Redco, Inc.

---

October 14, 2005

---

**DYK**, **Circuit Judge**.  On May 17, 1999, a fire occurred during a torch-cutting operation performed as part of a construction project in Maine.  A fire blanket had been used to protect the area beneath the welding.  The project was owned by Androscoggin Energy LLC ("Androscoggin") and insured by appellant Reliance Insurance Company ("Reliance").  Appellant Black & Veatch Construction, Inc. ("B & V") was the general contractor.  Appellees Redco, Inc. ("Redco") and O'Connor Constructors, Inc. ("O'Connor") were subcontractors.

Although the fire was quickly put out through the use of a fire extinguisher, the chemicals in the fire extinguisher caused damage to the generator.  The damage to the generator caused an estimated $9 million in repair and delay costs.  This incident led to the claims and cross-claims at issue in this case.

At the heart of the case are allegations that appellee Auburn Manufacturing, Inc. ("Auburn") manufactured the fire blanket and appellee Inpro, Inc. ("Inpro") distributed it; that the blanket caused the fire and the subsequent damage to the generator; that inadequate warnings accompanied the blanket; and that the blanket was unfit for its ordinary purpose.

The district court granted summary judgment on the product liability issues in favor of Auburn and Inpro. We conclude that the evidence was insufficient to allow a reasonable jury to find that any breach of the duty to warn proximately caused the

-3-

injury. We also conclude that there is no evidence that would support a finding that the fire blanket was unfit for its ordinary purposes. We accordingly affirm the judgment of the district court.

**I.**

The variety of claims and cross-claims at issue in these appeals can be briefly summarized. Reliance and B & V both assert product liability and breach of warranty claims against Auburn and Inpro. Auburn and Inpro assert a variety of defenses, and cross-claim against each other and Redco and O'Connor for contribution. Suffice to say that none of the claims before us can proceed to trial unless there is a triable claim against Auburn and/or Inpro.[1] Viewed in the light most favorable to the asserted liability against Auburn and Inpro, the evidence shows the following:

On May 17, 1999, Perry Austin ("Austin"), a Redco welder with 26 years of experience, was torch-cutting a steel lifting lug while poised on a ladder standing on a plywood platform above the generator. Because fires are a frequent occurrence during welding and cutting operations, a fire watch was present. The plywood platform was covered by a fire blanket.

During the cutting operation, pieces of molten slag fell onto the fire blanket covering the plywood platform. The molten

---

[1] Separately, Auburn and Inpro cross-appeal the denial of sanctions against B & V for alleged discovery abuse. We discuss that cross-appeal in Part IV, <u>infra</u>.

slag burned through and melted the fire blanket. A fire was started. Austin detected the fire and called out "fire." The fire watch retrieved a chemical fire extinguisher and handed it to Austin, who then used the fire extinguisher to extinguish the fire. Although the fire itself caused no damage, the corrosive chemicals discharged from the fire extinguisher damaged the generator beneath the plywood.

There is a substantial dispute as to whether there was sufficient evidence to establish that the fire blanket was manufactured by Auburn. The fire blanket was lost after the fire. However, three rolls of Auburn fire blankets, all distributed by Inpro, were delivered to the project. All three rolls of Auburn blankets were 1000 degree rated "medium duty" fire blankets. Neither the rating nor any kind of warning as to the limitations of the blanket was attached to the rolls of blankets themselves. Austin, despite his 26 years of welding experience, did not know that blankets had ratings, and did not expect the blanket to melt as it did.

In addition to medium duty blankets, Auburn also manufactures "heavy duty" blankets (with a 3000-degree rating) and "light duty" blankets (also with a 1000-degree rating). In its marketing materials, Auburn cautioned that a light duty blanket "should be used in a vertical, not horizontal, position," and that a medium duty blanket (the blanket allegedly used here) "should not

be used to horizontally capture and contain excessive, concentrated spatter or red-hot cut pieces." For the horizontal capture of concentrated spatter or red-hot pieces, Auburn recommended the use of its heavy duty blanket. Similar warnings appear on the packaging of blankets when the are sold individually (as opposed to in rolls). Inpro's catalog (from which the fire blanket was allegedly ordered) describes the product as "1000deg Spun Silicon Fire Blanket" and Inpro invoices described the product as "1000deg FB." There is some evidence that Redco or O'Connor received the catalog, and the invoices were issued to "Redco/O'Connor." The record does not reveal, however, whether the information in these marketing materials or invoices was ever conveyed to Austin.

Auburn and Inpro moved for summary judgment on the issues of duty and proximate causation, and on the breach of warranty claim. The district court granted summary judgment in favor of Auburn and Inpro on each of the issues of duty, breach and causation. The district court concluded that "the danger of fire in a horizontal capture application atop combustible material is open and obvious" (assuming the receipt of the warning as to the 1000-degree rating of the blanket), Recommended Decision at 19; "provision of the 1000-degree rating [in the catalog and invoice] discharged whatever duty to warn might reasonably be imposed in relation to professional welders," id. at 21; and there was no proof of causation because "not one [witness] testified that he

would have done anything differently to prevent this torch-cutting operation from taking place as it did had he been informed that Auburn's 1000-degree blanket material was not recommended for horizontal capture of concentrated spatter and red hot cuttings."[2] Id. at 24. The district court also granted summary judgment on the breach of warranty claim because "the evidence demonstrates that the blanket performed as expected." Id. at 25. Thereafter, on October 13, 2004, the district court denied B & V's motion for leave to supplement the summary judgment record as untimely.

## II.

The appellants' first theory of liability is failure to warn. Appellants advance this theory under both the common law of negligence and the Maine strict liability statute,[3] but

---

[2] References to opinions or decisions of the district court include recommendations of the Magistrate Judge adopted by the district court.

[3] The strict liability statute provides:

One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or to his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold. This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

-7-

"[r]egardless of whether a failure to warn claim is phrased in terms of negligence or strict liability, the analysis is basically the same." Pottle v. Up-Right, Inc., 628 A.2d 672, 675 (Me. 1993) (internal quotations and alterations omitted). "A products liability action for failure to warn requires a three-part analysis: (1) whether the defendant held a duty to warn the plaintiff; (2) whether the actual warning on the product, if any, was inadequate; and (3) whether the inadequate warning proximately caused the plaintiff's injury." Id. The plaintiff bears the burden of proof on each of these elements. Bouchard v. Am. Orthodontics, 661 A.2d 1143, 1145 (Me. 1995).

Under the three-part analysis outlined in Pottle, the first question is whether Auburn or Inpro had any duty to warn. The district court held that there was no duty to warn because "the danger of fire in a horizontal capture application atop combustible material is open and obvious," particularly considering that Austin was a sophisticated user of fire blankets. We disagree in some respects with the district court's analysis but agree with its

---

14 Me. Rev. Stat. Ann. § 221 (2004). Appellees submit that the language "physical harm . . . to his property" limits recovery to the plaintiff's own property, and that B & V cannot recover under strict liability because Androscoggin, rather than B & V, owned the damaged generator. B & V argues that it had a property interest in the generator as bailee. Because we conclude that there is no liability even if the statute applies, we need not resolve the question of whether a bailee can sue under the statute.

-8-

ultimate conclusion that summary judgment in favor of appellees should have been granted.

First, we agree that Maine law does establish that, generally, there is no duty to warn of dangers open and obvious to ordinary people. Lorfano v. Dura Stone Steps, Inc., 569 A.2d 195, 197 (Me. 1990) (danger of steps without handrail is "patently obvious and equally apparent to all"); Plante v. Hobart Corp., 771 F.2d 617, 620 (1st Cir. 1985) (applying Maine law). The Supreme Judicial Court has not yet explicitly adopted the sophisticated user doctrine that there is no duty to warn sophisticated users of dangers that are obvious to reasonable sophisticated users; however, because that doctrine is simply a corollary of the open and obvious doctrine, it seems that it would be adopted by the Supreme Judicial Court as part of Maine law given its widespread acceptance. See, e.g., Crook v. Kaneb Pipe Line Operating P'ship, L.P., 231 F.3d 1098, 1102 (8th Cir. 2000) (applying Nebraska law); Akin v. Ashland Chem. Co., 156 F.3d 1030, 1037 (10th Cir. 1998) (applying Oklahoma law); Am. Mut. Liab. Ins. Co. v. Firestone Tire & Rubber Co., 799 F.2d 993, 994 (5th Cir. 1986) (applying Louisiana law). We also agree that the danger of fire during torch cutting is open and obvious to both laymen and experienced welders like Austin.

Nonetheless, in holding that the duty to warn was precluded by the known hazard of fire in torch cutting, we think

that the district court gave too broad a scope to the open and obvious and sophisticated user doctrines. The fact that the risk of accident is well known does not preclude a duty to warn of particular risks, different from the general risk, if those risks are not open and obvious or known by a reasonable sophisticated user. For example, the risk of vehicle accidents on the highway is well known, and drivers of commercial trucks are sophisticated users of their equipment. There is no duty to warn of the general risk of an accident, nor of the possibility that operating a truck at a high rate of speed might cause an accident. But there may be a duty to warn that loading a particular kind of truck in a particular way could increase the risk of rollover (if that risk is not generally appreciated). In each case the analysis must focus on the particular risk and whether that risk is open or obvious or known to the sophisticated user.

Marois v. Paper Converting Machine Co., 539 A.2d 621, 624 (Me. 1988) is illustrative. In Marois, the plaintiff was injured while operating a paper machine. Although the plaintiff conceded that he knew that "the nip point area, the space between two large rotating rollers, was dangerous," he contended that he did not know that his hand might be drawn into it when clearing the machine, as in fact happened, and that a warning should have been provided. Id. The court held that the jury appropriately found liability, because a reasonable jury could find that "although generally aware

of the inherent danger of the operation, the specific danger of the machine's design and clearing process was not obvious to, or known by, the Plaintiff." Id. Similarly, in Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 29 (1st Cir. 2004), this court held under Massachusetts law that although the plaintiff admitted that he was aware that table saw blades "coasted" (i.e. continued spinning after the saw's power was shut off), and although the coasting risk was one that "any experienced user would assuredly know," the jury was entitled to return a verdict in plaintiff's favor on a failure to warn theory because it

> might have concluded . . . that he was not "fully aware" of the duration of the danger and that a more explicit or conspicuous warning would have heightened his awareness and prevented the accident.

Id. (internal citations omitted and emphasis added).

The record here could support the conclusion that welders were well aware of the risk of fire but unaware of the risks associated with using particular fire blankets. Not only did Austin testify that he personally did not know about fire blanket ratings and did not expect the blanket to melt, but also there is testimony that others in the field did not know that fire blankets had ratings and limitations. Thus, "although [Austin was] generally aware of the inherent danger of the operation," a jury might conclude that "the specific danger" of the fire blanket's design and operation "was not obvious to, or known by, the Plaintiff." Marios, 539 A.2d at 624.

-11-

The necessity of such particularized analysis places a premium on defining the claimed risk and the warning that should have been provided so that the issues of duty to warn and causation can be addressed intelligently.  As the district court noted, the "parties' memoranda largely conflate the distinct issues of duty, breach and causation."  Recommended Decision at 18.  In response to this court's questions at oral argument, B & V's counsel argued that it was not the plaintiff's obligation to articulate a particular suggested warning, but rather the entire duty to warn question should somehow be thrown to the jury.  This position completely misunderstands the plaintiff's burden in a negligence action.  It is the plaintiff's burden to establish a duty to warn and to prove proximate causation of loss resulting from the failure to warn.  Bouchard, 661 A.2d at 1145.

Thankfully, the appellants have not rested on such a completely unsupportable position, and the record reveals that appellants have suggested several different potential warnings. So far as we can discern, the appellants have suggested four different warnings: (1) "use only in vertical applications"; (2) "not appropriate for cutting operations"; (3) "1000 degrees rated"; or (4) "not suitable for horizontal capture of concentrated spatter and red-hot cut pieces."  B & V argues that inclusion of a warning is particularly important because Auburn admits in its marketing materials that "making the right choice [of fire blanket] ... can

-12-

be confusing." We will analyze each of these proposed warnings in turn.

### "Use only in vertical applications."

Appellants argue that in its marketing materials, Auburn states that its light duty blankets "should be used in a vertical, not horizontal, position," and that on the packaging of individual light duty blankets, there is a label that states, "Primarily for vertical use."

The problem is that there is no evidence that the fire blanket here was a light duty blanket. Rather, the district court concluded that the evidence showed the subject blanket was a medium duty blanket. Recommended Decision at 10. B & V's counsel expressly agreed at oral argument that the subject blanket "was a medium duty blanket." Since there is no evidence in the record that a medium duty blanket was in fact inappropriate for horizontal applications, there is again no duty to warn against such use.

### "Not appropriate for cutting operations."

This was the warning suggested by B & V's engineering expert, Robert Waite ("Waite"). Waite testified at deposition that there should be a warning on the roll of 1000-degree fire blanket stating "that it was inappropriate for cutting operations." The problem for B & V is that Waite's testimony on this point was excluded by the district court. The district court concluded that, based on Waite's personal experience, he was qualified to testify

-13-

that "there is a danger of fire when molten slag falls on a 1000-degree rated welding blanket."  Recommended Decision at 15. However, the district court determined that Waite had failed to explain any underlying methodology to justify his further opinion that the 1000 degree blanket was inappropriate for cutting operations, and excluded that testimony.  This exclusion was presumably based on the Supreme Court's decision in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  See also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 (1999) (extending Daubert to all expert testimony).

We agree with the district court's exclusion of Waite's testimony.  Daubert requires, with respect to expert testimony, "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  Daubert, 509 U.S. at 592-93.  We review the district court's determination for abuse of discretion.  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142-43 (1997).  Waite completely failed to articulate any methodology for determining the appropriateness of a fire blanket for particular operations.  The district court did not abuse its discretion in excluding this portion of Waite's testimony.

B & V submits in the alternative that Auburn did not properly challenge Waite's testimony, and that the district court

-14-

improperly decided the issue <u>sua</u> <u>sponte</u> without affording B & V the opportunity to respond.  We disagree.  Auburn's motion to exclude stated:

> [Waite] did come up with a warning that he believed should have been provided with the roll of fire blanket: "this blanket is inappropriate for cutting operations." However, this opinion is not supported by the kind of scientific theory, practical knowledge and experience, or empirical research and testing required under Rule 702 and <u>Daubert</u>.  In fact, it was not supported by anything at all.

<u>Auburn's Motion to Exclude Warnings Experts</u>, Docket No. 180, at 2-3 (filed Apr. 30, 2004) (citations omitted).  Although the reference to "this opinion" is admittedly vague, we think that the district court reasonably viewed the motion as challenging Waite's failure to articulate a methodology regarding the appropriateness of blankets.

Without Waite's testimony, there is no evidence in the record to indicate that the fire blanket was in fact inappropriate for cutting operations.  There is therefore no evidence to support a duty to warn against such use.

### "1000 degrees rated"

There is no dispute that the blankets supplied by Auburn and Inpro were rated at 1000 degrees.  Given the testimony that welders generally have no knowledge of the rating and limitations of individual fire blankets, a reasonable jury could conclude that

the supplier had a duty to inform the user about the blanket's rating.[4]

It is also undisputed that no such label or warning was provided on the blanket roll or its packaging. However, Inpro's catalog describes the product as "1000deg Spun Silicon Fire Blanket," and the invoice issued to "Redco/O'Connor" described the product as "1000deg FB." The district court concluded that an inscription "1000deg" on the catalog and invoice for the blankets provided adequate warning, and thus there was no breach of the duty to warn.

As a general rule, the duty to warn is the duty to "exercise reasonable care to . . . inform the user." Pottle, 628 A.2d at 675 (internal quotation omitted). That is, the supplier generally has the duty to warn "all those who are members of a class whom the supplier should expect to use" the item supplied. Restatement (Second) of Torts, § 388 cmt. a (1965); see also Austin v. Raybestos-Manhattan, Inc., 471 A.2d 280, 286-87 (Me. 1984) (Maine courts respect ALI's restatements of the law). There is no suggestion that the ultimate user, Austin, could reasonably be

---

[4] Auburn suggests that imposing a duty to warn about a 1000 degree blanket effectively imposes a duty to inform users about the availability of alternative products. We disagree. At least in the circumstances of this case, there is no duty to inform users of the availability of a 3000 degree heavy-duty blanket. There is, however, a duty to inform users of the dangers and limitations of a 1000 degree blanket that reasonable users could not be expected to know.

expected to read the catalog or invoice.  The fact that Inpro may have provided a warning to Redco or O'Connor through the catalog and invoice would not usually absolve it of the duty to warn the foreseeable ultimate user of the blanket -- Austin.

However, the overwhelming majority of jurisdictions have recognized an exception to the general rule when the warnings are received by a "learned intermediary" who may be expected to warn the ultimate user.[5]  The Maine Supreme Judicial Court has not yet explicitly adopted the learned intermediary doctrine, and it is not entirely clear that the district court was relying on that doctrine to hold that the catalog and invoice were sufficient to prevent a breach of the duty to warn.  We ultimately need not address whether Maine would adopt the learned intermediary doctrine, nor whether it is applicable here, because even assuming (without deciding) a breach of the duty to warn, we are unable to find any evidence that would permit a reasonable jury to find proximate causation.

The only evidence of causation in the record is Austin's testimony that, had the blanket been labeled "1000 degrees rated," he would have consulted his foreman.  This testimony is not

---

[5]  Generally stated, these jurisdictions hold that a supplier is absolved of the duty to warn later purchasers and users down the chain of distribution when "(1) the product is sold to an intermediary with knowledge or sophistication equal to that of the manufacturer; (2) the manufacturer adequately warns this intermediary; and (3) the manufacturer can reasonably rely on the intermediary to warn the ultimate consumer." First Nat'l Bank and Trust Corp. v. Am. Eurocopter Corp., 378 F.3d 682, 691 (7th Cir. 2004) (applying Indiana law).

sufficient for a jury to find causation because there is no follow-up testimony by the foreman as to what he would have done in response to Austin's hypothetical inquiry. Nor is there evidence as to what the ordinary user would have understood the 1000 degree rating to mean or that, if a 1000 degree rating had been on the blanket, this would have been understood by welders to limit the blanket to particular uses or suggested that the particular use of the blanket here would have been inappropriate. In the absence of such testimony, it would be entirely speculative for the jury to conclude that the foreman would have ordered a course of action different from that which occurred. Indeed, Austin testified that even if the blanket had been labeled "1000 degrees rated," he likely would have used it anyway: "I would have just figured the job was set up and it was proper that way .... As far as rating on that blanket, I wouldn't know." "When there is so little evidence tending to show a critical element of a plaintiff's claim that the jury would have to speculate in order to return a verdict for the plaintiff, a defendant is entitled to a summary judgment." Beaulieu v. Aube Corp., 796 A.2d 683, 692 (Me. 2002).

### "Not suitable for horizontal capture of concentrated spatter and red-hot cut pieces."

This warning appears on the packaging of individual medium duty blankets. Auburn's marketing material likewise cautions that a medium duty blanket, "[w]hile primarily for vertical use, ... may be used as drapes and drop-cloths where

-18-

exposure to excessive spatter is minimal, but they should not be used to horizontally capture and contain excessive, concentrated spatter or red-hot cut pieces." The contention that this particular warning should have been supplied was only briefly mentioned in the appellants' opposition to summary judgment and on appeal.

We may safely assume for present purposes that, based on the packaging of individual blankets and the marketing material, a reasonable jury could find that the medium-duty blanket was dangerous when used in horizontal capture of concentrate spatter or red-hot cut pieces.[6] On this assumption, the jury would be entitled to conclude that there was a duty to warn that the medium-duty blanket was "not suitable for horizontal capture of concentrated spatter or red-hot cut pieces." It is undisputed that no such warning was provided. Therefore, a reasonable jury could find the duty to warn breached.

However, we find no evidence in the summary judgment record that would permit a reasonable jury to find proximate cause. Our attention has not been called to the testimony of any witness indicating that anything would have been done differently had the

---

[6] See, e.g., Downing v. Overhead Door Corp., 707 P.2d 1027, 1034 (Colo. App. 1985) (evidence of the subsequent warning used to establish duty); Bartlett v. Gen. Elec. Co., 90 A.D.2d 183, 185-86 (N.Y.A.D. 1982) (same); Burke v. Almaden Vineyards, Inc., 86 Cal. App. 3d 768, 773 (1978) (same).

above-described warning been attached.[7]   The district court concluded that B & V never even argued at summary judgment that this proposed warning would have prevented the fire.  Indeed, our review of the summary judgment record does not suggest that the question was even presented to any witness.

Faced with this hurdle, B & V invokes the legal presumption that a warning will be heeded.  See, e.g., Boerner v. Brown & Williamson Tobacco Corp., 260 F.3d 837, 842-845 (8th Cir. 2001) (applying Arkansas law); Eck v. Parke, Davis & Co., 256 F.3d 1013, 1018 (10th Cir. 2001) (applying Oklahoma law); Hisrich v. Volvo Cars of N. Am., Inc., 226 F.3d 445, 451 (6th Cir. 2000) (applying Ohio law).  We agree that such a presumption exists in Maine law.  The Supreme Judicial Court has adopted the principle, set out in the Second Restatement of Torts, that:  "Where warning is given, the seller may reasonably assume that it will be read and heeded."  Bernier v. Raymark Indus., 516 A.2d 534, 538 (Me. 1986)(quoting Restatement (Second) of Torts § 402A cmt. j (1965)).  See also Knowlton v. Deseret Med., Inc., 930 F.2d 116, 123 (1st Cir. 1991) (applying Massachusetts law).

---

[7]     The O'Connor purchasing agent responsible for acquiring the fire blankets, James Adams, testified that he would never "knowingly order the wrong product."  However, there is no evidence indicating that Adams would have concluded that Auburn's fire blanket was the wrong product even if he had received the warnings (other than the 1000-degree rating).  He did receive the 1000-degree warning, which did not cause him to order a different blanket.

The problem is that even after applying the presumption to the facts of this case, there is still no evidence of causation in fact. The presumption that a warning would be heeded would readily support a finding that, had Austin been engaged in "horizontal capture of concentrated spatter or red-hot cut pieces," he would have desisted. The crucial evidence lacking is any evidence that this was horizontal capture of <u>concentrated</u> spatter or <u>red-hot</u> cut pieces. B & V's counsel conceded at oral argument that "there is no testimony that particularly says this is concentrated spatter . . . the only thing in the record is that there is molten slag that is generated from a cutting application." Without testimony that the blanket was being used to horizontally capture concentrated spatter or red-hot cut pieces, or that molten slag is the equivalent of concentrated spatter,[8] the legal presumption that a warning against such use would have been heeded is of no aid to appellants. Appellants thus fail to meet their burden of producing evidence sufficient to prove causation in fact under this proposed warning.

---

[8] Auburn's marketing materials themselves appear to distinguish between "slag" and "concentrated spatter." The 1000-degree AMI-GLAS blanket, Auburn states, generally "offer[s] excellent protection against vertical spark and slag when used" as a dropcloth or protective curtain. However, Auburn's 1000-degree AMI-GLAS medium-duty blanket "should not be used to horizontally capture and contain excessive, concentrated spatter or red-hot cut pieces." (Emphasis added.)

In sum, we cannot find, under any of the four suggested warnings, record evidence sufficient to support both a duty to warn and a finding that the damage to the generator would not have occurred if the warning had been provided. Because the appellants have failed to produce evidence sufficient to sustain their burden of proof, summary judgment in favor of the appellees on the issues of negligence and strict liability was properly granted.

## III.

In addition to its negligence and strict liability claims, the appellants also brought breach of warranty claims against Auburn and Inpro. Presumably, this refers to the implied warranty of merchantability, though in the four lines in its brief addressing the breach of warranty claim, B & V did not bother to say so. This, in itself, would furnish a basis for rejecting B & V's claim. See United States v. Zannino, 895 F.2d 1, 17 (1st 1990). Moreover, even were we inclined to overlook the cursory briefing, we would nonetheless affirm the entry of summary judgment. We explain briefly.

As an initial matter, Reliance and B & V may bring the breach of warranty claim despite the lack of a contractual relationship with Auburn and Inpro. Breach of the implied warranty of merchantability is a tort under Maine law and does not require privity of contract. 11 Me. Rev. Stat. Ann. § 2-318 (2004). See Ouellette v. Sturm, Ruger & Co., 466 A.2d 478, 483 (Me. 1983).

Under the Maine version of the Uniform Commercial Code, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 11 Me. Rev. Stat. Ann. § 2-314(1) (2004). There is no dispute that both Auburn and Inpro are merchants of fire blankets. To be "merchantable," a good must be "fit for the ordinary purposes for which such goods are used." 11 Me. Rev. Stat. Ann. § 2-314(2)(c) (2004).

The first step of the analysis is whether the good was being used for its ordinary purposes. The plaintiff bears the burden of establishing the ordinary purposes of a good. Binks Mfg. Co. v. Nat'l Presto Indus., 709 F.2d 1109, 1121 (7th Cir. 1983). "[T]he ordinary purposes for which goods are used . . . go to uses which are customarily made of the goods in question." U.C.C. § 2-315 cmt. 2 (2004). Examining the record, it is far from clear that Austin was using the fire blanket for its "ordinary purposes." Although there is no evidence that a fire blanket was inappropriate for cutting operations or horizontal capture generally, there also appears to be no evidence that the fire blanket was appropriate for such use. However, Auburn and Inpro appear to have waived this issue below, when they represented that they do "not contend that the wrong blanket was used for the application described by Perry Austin." Therefore, we must address whether the appellants have

carried their burden of producing evidence sufficient to support a finding that the blanket was "unfit" for this purpose.

In Lorfano, the Supreme Judicial Court held that steps outside a building were fit for their ordinary purpose because they "performed as expected." 569 A.2d at 197. The district court held there was no breach of warranty here because the fire blanket likewise "performed as expected" and was thus fit for its ordinary use. Recommended Decision at 25 (citing Lorfano, 569 A.2d at 197). B & V responds that since Austin was surprised that the blanket melted,[9] it obviously did not perform as Austin expected. That is true but not on point. The question is not the subjective expectations of the particular user, but the reasonable expectations of an ordinary user or purchaser. See Venezia v. Miller Brewing Co., 626 F.2d 188, 190 (1st Cir. 1980) ("Under

---

[9] Austin's testimony may fairly be described as occasionally self-contradictory and lacking in clarity. Viewing the record in the light most favorable to the appellants, the pertinent testimony was as follows:

> Q: So, what you're saying is you were mistaken in your assumption that the blanket would stop a fire?
> A: Yes.
> Q: But you don't think there's anything wrong with the blanket?
> A: Other than the fact that it started melting on me, no.
> . . .
> Q: Did the blanket actually start melting?
> A: It was bubbling up, black.
> . . .
> Q: So, were you pretty surprised to see that?
> A: Oh, yes. Very surprised.

Massachusetts law the question of fitness for ordinary purposes is largely one centering around reasonable consumer expectations."). For example, in Alevromagiros v. Hechinger Co., 993 F.2d 417 (4th Cir. 1993), the Fourth Circuit, applying Virginia law in a product liability and breach of warranty case, held that the standard was objective rather than subjective. An expert witness testified that, "tragically," the industry standards used in the manufacture of the allegedly unfit ladder "did not require triangular braces on the rear portion of a ladder." Id. at 420. The court held that this testimony was not sufficient to take the issue of the reasonableness of the standards to the jury, because the expert

> testified to no customs of the trade, referred to no literature in the field, and did not identify the reasonable expectations of consumers. His comment that the advisory industry standards "tragically" did not require the use of triangular braces does not constitute proof that industry standards are inadequate. It is merely another example of his own subjective opinion.

Id. at 421.

As the district court concluded, there is no testimony in the summary judgment record here (for example, by experts in the field) that the ordinary user reasonably expected a fire blanket to prevent the type of melting that Austin observed. Indeed, there is testimony by others, for example, the foreman Paul Gagnon, that while he expected the blanket to contain sparks and small fires, he thought the blanket performed as they expected and that burn-through holes in blankets were not uncommon.

Because B & V failed to produce evidence establishing the expectations of ordinary users beyond the subjective views of a single individual, summary judgment on the breach of warranty claim was properly granted.[10]

## IV.

On the cross-appeal, Auburn argues that the district court abused its discretion in refusing to impose monetary sanctions for discovery violations. The crux of the complaint appears to be that B & V delayed in providing, or failed to provide, certain documents pertaining to the calculation of damages

---

[10] B & V argues that the district court erred in denying B & V's motion for leave to supplement the record. We disagree. The district court denied B & V's motion as untimely because it was filed after the district court had received the Magistrate Judge's recommended disposition of the dispositive motions. The district court rejected B & V's argument that the Magistrate Judge considered issues not raised by either party when deciding summary judgment, finding that the allegedly "new" issues "were points of factual and legal controversy properly subsumed in the evidentiary record [and] written submissions and argumentation of counsel." Koken v. Auburn Mfg., No. 02-83-B-C, slip. op. at 6 (D. Me. Oct. 13, 2004). The district court concluded that granting B & V's motion after completion of proceedings before the Magistrate Judge "would undermine and undo the efforts of the Magistrate Judge to accomplish the resolution of the issues generated by the dispositive motions on a comprehensive record and after full ... argumentation ... by counsel." Id., slip op. at 2.

"District courts exercise broad discretion to manage discovery matters." Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd., 333 F.3d 38, 41 (1st Cir. 2003). The district court did not abuse its discretion in denying B & V's motion. See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

In addition, we see no error in the district court's conclusion that the portion of the Hilsop deposition called to its attention was irrelevant to the issues before the district court.

by experts, particularly the electronic versions of the files. Auburn claims that B & V's failure to timely provide documents drove up the cost of document review.

The district court held that "Auburn was entitled to these materials and eventually received them through discovery. That Black & Veatch made the process more difficult than it need be, appears obvious ... ." Koken v. Auburn Mfg., No. 02-83-B-C, slip op. at 2 (D. Me. Aug. 20, 2004). However, because the district court "stayed all expert discovery for a time, at Auburn's request, . . . it is unclear whether Black & Veatch was deliberately obfuscating or merely stopped its discovery related expert activities because of the stay ... ." Id. Under these circumstances, the district court concluded that imposing monetary sanctions was inappropriate.

Review of the district court's refusal to impose of sanctions is for abuse of discretion. United States v. One 1987 BMW 325, 985 F.2d 655, 657 (1st Cir. 1993). "All in all, a party protesting an order in respect to sanctions bears a formidable burden in attempting to convince the court of appeals that the lower court erred." Id. So far as we can tell, Auburn is arguing that the district court abused its discretion because the factual predicate for its decision was clearly erroneous. See Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 4-6 (1st Cir. 1999). Specifically, Auburn asserts that, contrary to the district court's

finding, it did not eventually receive all the material it was entitled to through discovery.

Attorney argument is not a substitute for evidence that Auburn did not receive the materials. The only actual evidence that Auburn submits to support this claim is an affidavit from its damages expert, Robert Peterson ("Peterson"). Peterson asserted in his affidavit that some Engineering Change Notices ("ECNs") were discoverable, requested, and never produced. B & V asserts that the ECNs were produced for Auburn's review during a document review trip in Raleigh, North Carolina. To this, Peterson testified at deposition that it was his belief that if they had been produced at Raleigh, the ECNs would have been found. Auburn has not, however, asserted that it exhaustively searched everything produced at Raleigh, or provided other evidence substantiating Peterson's beliefs on this matter. We do not think that Peterson's belief, unsupported by further evidence, is enough to show clear error in the district court's findings. Accordingly, we find that the district court did not abuse its discretion in denying sanctions.

## V.

In summary, we hold that (1) summary judgment in favor of appellees on the negligence and strict liability claims was properly granted because there is no evidence in the record sufficient to support a jury verdict; (2) summary judgment in favor of appellees on the breach of warranty claim was properly granted

because the appellants failed to produce evidence sufficient to support a jury finding that the fire blanket did not perform as an ordinary user would reasonably expect; and (3) the district court did not abuse its discretion in declining to impose sanctions. In light of the above, the remaining issues presented need not be reached. The judgment of the district court is affirmed.

It is so ordered.