SolmeteX, LLC (SolmeteX), a manufacturer and distributor of a device known as an amalgam separator, initiated this action against its former head of sales and marketing, Al Dube, and one of its competitors, Enpress, LLC (Enpress),[3] asserting a variety of claims arising from the alleged misappropriation of confidential information. Two of those claims, against Dube for breach of the duty of loyalty and against Enpress for aiding and abetting said breach, were tried over several days to a jury, which returned a verdict in SolmeteX's favor, but only awarded $940 in damages. The remaining three claims, against Dube for fraud and against Enpress for unfair and deceptive trade practices (G. L. c. 93A) and breach of contract, were decided by the trial judge, responding to special questions. The judge found against SolmeteX on all claims. The parties have now filed cross appeals.[4]
For its part, SolmeteX argues that the judge made certain evidentiary errors, provided an erroneous instruction to the jury, and, as to the claims on which he rendered verdicts, committed clear and reversible error. Dube and Enpress, meanwhile, argue that the judge should have allowed their motions for directed verdicts on the duty of loyalty claims, and that they should be awarded fees and double costs for what they suggest is a frivolous appeal. For the reasons set forth below, we affirm the judgment in its entirety and decline the requests for fees and costs.
Background. We briefly review the evidence, keeping in mind that the facts relevant to each claim are to be considered in the light most favorable to the respective prevailing party. See Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 94 n.5 (2009). We reserve discussion of certain facts for our analysis.
An amalgam separator is a device that, often as required by State regulation, is used by dental offices to isolate and remove the mercury-based material used for fillings (the amalgam) from waste water before it is discharged into the sewage system. SolmeteX is the manufacturer and distributor of one such device, known as the "Hg5." Unlike other amalgam separators on the market, the Hg5 was designed with a canister for capturing amalgam that, when full, could be removed by the dental office, mailed to a recycling facility using a special package provided by SolmeteX,[5] and replaced with a new SolmeteX canister. By design, therefore, the Hg5 provided SolmeteX with both a marketing advantage and the potential for an ongoing revenue stream following the original sale. And due, at least in part, to this unique canister replacement and recycling feature, the Hg5 was the most widely used amalgam separator in the United States and Canada, with SolmeteX estimating that it controlled seventy-five percent of the market.
After the Hg5 had been on the market for approximately thirteen years, SolmeteX learned that Enpress was entering the market with a competing amalgam separator, the AVTMax, which included a canister replacement and recycling feature. The canister on the AVTMax was also designed to fit on the Hg5, thereby presenting an even more direct threat of competition to SolmeteX's business. At or about the same time, SolmeteX further discovered that its longtime head of sales and marketing, Dube, who recently resigned, had, while still employed at SolmeteX, been engaged in extensive communications with individuals at Enpress during the planning stages for the AVTMax. Dube, who was not subject to a noncompete agreement with SolmeteX, was hoping to be offered a job at, and even an equity interest in, Enpress, neither of which materialized. In fact, the people at Enpress had determined early on that they were not interested in hiring Dube, yet continued to lead him on and solicit information from him for several months.
During those communications, Dube provided Enpress with feedback on its testing of the AVTMax, a projected budget for the sale and marketing of the device, insight into the regulatory environment governing the disposal of amalgam, the identity of the dealers who distributed the Hg5 for SolmeteX, and certain cost and pricing information. He also surreptitiously shipped an Hg5 to Enpress, free of charge. Through all of this, however, Dube, who was not an engineer or scientist and had not been responsible for designing the Hg5, did not disclose any trade secrets[6] or internal documents[7] to Enpress. Moreover, the information he did disclose was, to one extent or another, publicly available or easily discovered. In fact, there was already an extensive amount of detailed information regarding the design of the Hg5 that SolmeteX had openly posted on its own Web site and in videos on a popular Internet site (youtube.com). Still further, SolmeteX, convinced that the Hg5 was not sufficiently novel, never sought to secure patent protection for the device. Consequently, anyone could purchase an Hg5, which was even available on prominent retail Internet sites like eBay and Amazon, and readily replicate it. One company, based in China, had already done exactly that.[8] As SolmeteX's chief executive officer acknowledged at trial, Enpress did not need to talk to Dube to create the AVTMax.
When SolmeteX initiated this action, it sued not only Dube and Enpress, but also two other parties, Owen Boyd and Air Techniques, Inc. (ATI). Boyd was SolmeteX's founder and former president and chief executive officer, who was involved in designing the Hg5. He left SolmeteX a year or so before Dube and eventually came to consult with Enpress on the design of the AVTMax. It was Boyd who introduced Dube to Enpress. ATI, meanwhile, was the leading manufacturer and distributor of vacuum pumps, the device to which an amalgam separator is attached. It too sold an amalgam separator, which competed with the Hg5. While still with SolmeteX, Dube held talks with ATI about selling the Hg5 and ATI's vacuum pump together as a package. Subsequently, Dube introduced ATI to Boyd, which then led to ATI engaging in its own talks with Enpress about forming a joint venture to sell the AVTMax with its vacuum pumps. Ultimately, ATI did not go forward with either joint venture, but it did hire Dube away from SolmeteX. Prior to trial, both Boyd and ATI settled with SolmeteX.
Analysis. We address the arguments advanced on appeal, albeit not in the order presented.
1. Duty of loyalty. Dube and Enpress argue that there was insufficient evidence to warrant the jury verdicts on the duty of loyalty claims and that their motions for directed verdicts should have been allowed. In denying those motions, the trial judge acknowledged that it was a "very close question" and that SolmeteX had "just barely" done enough to justify putting the claims to the jury.[9] We concur and conclude that the same effectively can be said for the resulting verdicts; while the evidence was far from overwhelming, there was enough for the jury to have found that Dube, aided and abetted by Enpress, breached the duty of loyalty.
"Employees occupying a position of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer." Chelsea Indus., Inc. v. Gaffney, 389 Mass. 1, 11 (1983) (Gaffney ). Here, SolmeteX argued to the jury that Dube, aided and abetted by Enpress, violated that trust and confidence by both disclosing confidential information and actively competing with his own employer. See Gaffney, 389 Mass. at 11-12 (an executive employee is barred from actively competing with his employer during the tenure of his employment, even absent a noncompetition agreement); Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172-173 (1991) (Augat ) (an at-will employee may plan and take active steps to go into competition with his current employer, but cannot appropriate trade secrets or other confidential information). As noted above, however, SolmeteX failed to establish that any of the information Dube disclosed during his communications with Enpress was confidential. Much of it was already in the public domain or could be easily acquired and duplicated by others. Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972) (identifying the same as among the factors to be considered in assessing whether information is confidential). Much of it was also based on the general knowledge and experience Dube had acquired and developed over his many years of working in the amalgam separator industry. See id. at 839 ("[A]n employee may carry away and use general skill or knowledge acquired during the course of his employment"). In terms of timing, meanwhile, Enpress did not begin marketing the AVTMax until several months after its last communication with Dube. The jury, therefore, properly may have concluded that Dube and Enpress were not engaged in active competition with SolmeteX at the time of the subject communications.
With all of that being said, Dube did ship an Hg5 to Enpress. And while Enpress arguably could have purchased one from other available sources, it did not. Instead, it received one for free, at SolmeteX's expense. That was improper. See Augat, 409 Mass. at 173 ("[A] person may not act for his future interests at the expense of his employer by using the employer's funds or employees for personal gain"). It is apparent that the jury found as such, since they indicated on the verdict slip that the $940 damage award represented "[t]he cost of 1 Hg5 and [two] canisters."[10] We do not see any basis for overturning that verdict.[11]
2. Evidentiary rulings. "Whether evidence is relevant is a question addressed to the sound discretion of the trial judge. It is similarly within the judge's discretion to decide whether the probative value of the evidence outweighs the possibility that it would mislead or prejudice the jury. We will not reverse such decisions unless there is palpable error." Carrel v. National Cord & Braid Corp., 447 Mass. 431, 446 (2006) (Carrel ) (citations and quotations omitted).
a. SolmeteX's sales and profitability. SolmeteX first argues that the trial judge erred by admitting evidence that SolmeteX's overall sales and profitability continued to grow after the AVTMax came to market. According to SolmeteX, the evidence was irrelevant because it had elected to seek to recover damages based on Enpress' ill-gotten gain (i.e., the number of AVTMaxs and replacement canisters that Enpress had sold and could reasonably be expected to sell in the future, multiplied by the average profit SolmeteX made on similar sales). Alternatively, SolmeteX argues that, even if the evidence had some probative value, it was outweighed by the possibility that it misled or prejudiced the jury -- a possibility it deems likely given the small damage award of $940. We disagree, on both accounts.
While SolmeteX objected on several occasions to the admission of the sales and profitability evidence, on others it did not. "The consequence of the failure properly to object at trial is to waive the issue on appeal." Hoffman v. Houghton Chem. Corp., 434 Mass. 624, 639 (2001). In addition, the Hg5 accounted for virtually all of SolmeteX's revenue. The fact that revenue continued to grow after the AVTMax came to market, therefore, was relevant to both the general issue of harm and SolmeteX's specific assertion that every sale of an AVTMax otherwise would have been of an Hg5. See Mass. G. Evid. § 401 (2018) (evidence "is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence and (b) the fact is of consequence in determining the action"). The issue also was not so complex as to have confused the jury, and, in that regard, SolmeteX was free to argue that its ongoing sales and profitability were irrelevant to the harm it purported to have suffered. Finally, SolmeteX cannot make "a plausible showing that the trier of fact might have reached a different result if the evidence had [not] been before it." DeJesus v. Yogel, 404 Mass. 44, 48-49 (1989). As discussed above, while there was sufficient evidence that Dube, aided and abetted by Enpress, breached his duty of loyalty, any such breach was not substantial. The $940 award is more likely a product of that reality than of the jury having been misled or prejudiced by the admission of the sales and profitability evidence.
b. Owen Boyd & Air Techniques, Inc. At trial, Enpress presented, through the reading of deposition transcripts, the testimony of both Boyd and a representative of ATI as part of its defense. In response, SolmeteX requested that the jury be informed that Boyd and ATI formerly had been defendants. SolmeteX maintained that this information was relevant to an assessment of the witness's credibility and potential bias. The judge declined. SolmeteX now suggests that amounted to clear error. Again, we disagree. The potential risks and prejudice associated with admitting the evidence far outweighed any possible relevance.
First, had the jurors been informed of the bare fact that Boyd and ATI were formerly defendants, as SolmeteX requested, it is likely to have prompted unnecessary, and even unanticipated, speculation regarding why they were defendants in the first place, why that was no longer the case, and what that might mean in terms of not only Boyd's and ATI's credibility and potential bias, but also SolmeteX's credibility. Second, Boyd had, prior to testifying at the deposition that was used at trial, agreed as part of his settlement to cooperate fully with SolmeteX and testify truthfully. Yet SolmeteX did not propose to disclose that contractual obligation, or even the existence of the settlement, to the jury. It would have been misleading to withhold that information while simultaneously suggesting that Boyd was biased against SolmeteX because it had sued him. All told, therefore, the judge acted well within his discretion, and certainly did not commit clear error, when he declined to take the trial and jury down what amounted to a veritable rabbit hole.
Even if we were to deem the decision to exclude the evidence to be an error, we have substantial confidence that it did not materially affect the outcome of the trial. See Carrel, 447 Mass. at 450. It could not possibly have been lost on the jury that if Boyd and ATI were aligned with any of the parties, it was with Dube and Enpress.
3. Substantial contributing factor instruction. SolmeteX next argues that the judge erred when he declined to give a "substantial contributing factor" instruction to the jury. "The 'substantial contributing factor' test is useful in cases in which damage has multiple causes, including but not limited to cases with multiple tortfeasors in which it may be impossible to say for certain that any individual defendant's conduct was a but-for cause of the harm, even though it can be shown that the defendants, in the aggregate, caused the harm." Matsuyama v. Birnbaum, 452 Mass. 1, 30 (2008) (emphasis in original).[12] SolmeteX fears that the jury returned such a small damage award ($940) because they concluded that Boyd was also a contributing cause of the alleged harm, but, having not been provided with the requested instruction, were unaware that they could still hold Dube and Enpress liable for the full extent of the harm SolmeteX suffered. The fear, however, is unwarranted. While there was evidence that Boyd helped Enpress to design and market the AVTMax, when he did so he was no longer employed by SolmeteX, was not subject to a noncompete agreement, and was not shown to have disclosed any of SolmeteX's confidential information. In other words, there was no evidence to suggest that he was engaged in any wrongdoing or causing any legally cognizable harm to SolmeteX when he aided Enpress. As the judge rightly concluded, there was no factual basis for a substantial contributing factor instruction.
4. The judge's verdicts. Regarding the claims tried to the judge, his findings of fact cannot be set aside unless they were clearly erroneous, and due regard must be given to the opportunity he had to assess the credibility of the witnesses. Mass.R.Civ.P. 52(a), as amended by 423 Mass. 1402 (1996). See Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977). The question for an appellate court is not whether we would have made the findings that he did, but whether on the entire evidence we are "left with the definite and firm conviction that a mistake has been committed." Kenner v. Zoning Bd. of Appeals of Chatham, 459 Mass. 115, 119 n.3 (2011) (quotation omitted). Given the manner in which the judge rendered his verdicts, responding (yes or no) to special questions, we are not privy to his underlying reasoning. The verdicts, however, all have support in the evidence.
a. Fraud. While Dube was engaged in his communications with Enpress, SolmeteX itself was in the process of being sold to a group led by an entity known as Gemini Investments (Gemini).[13] As part of that transaction, Gemini required members of the senior management team at SolmeteX to sign noncompete agreements. Dube was the only one who refused to do so. On the day the transaction was scheduled to close, therefore, Gemini's managing director, James Rich, met with Dube to discuss his concerns. According to Rich, Dube provided assurances during that meeting that he was not considering either moving to another company or competing with SolmeteX, and that he intended to remain with the company. In reliance on those alleged representations, Gemini decided to stay the course and close the transaction. When Dube's communications with Enpress subsequently came to light, however, SolmeteX alleged that those representations amounted to actionable fraud. The judge disagreed. SolmeteX now argues that the verdict was contrary to the overwhelming evidence and clearly erroneous. The record suggests otherwise.
First, Dube is alleged to have made his fraudulent representations to a representative of an entity that is not a party to this action, Gemini. It is that party that is alleged to have acted in reliance thereon, by moving forward with its purchase of SolmeteX. To the extent that any fraud claim even existed, therefore, it belonged to Gemini, not SolmeteX.[14] There is also no evidence that Gemini ever assigned such a claim to SolmeteX, if that is even possible. See Nova Assignments, Inc. v. Kunian, 77 Mass. App. Ct. 34, 41-42 (2010) (discussing the bar against assigning fraud claims and questioning, but not deciding, whether it still survives). In addition, Dube disputed Rich's version of what transpired at their meeting and testified that Rich only asked him whether he had an offer from another company, to which he truthfully replied in the negative. The judge, who, unlike us, weighs the credibility of the witnesses, may have credited that testimony and concluded that there was no misrepresentation. In either case, we are not left with a definite and firm conviction that a mistake has been committed.
b. General Laws c. 93A. SolmeteX next argues that, given the jury's finding that Enpress aided and abetted a breach of fiduciary duty by Dube, the judge committed clear error when he went on to reject SolmeteX's claim against Enpress for unfair and deceptive trade practices. This need not detain us long. "A practice is unfair if it is within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to other businessmen." Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 27 (1997) (citation and quotation omitted) (emphasis added). As discussed above, while there was sufficient evidence to establish that Enpress aided and abetted a breach of the duty of loyalty by Dube, neither the objectionable act itself nor the resulting damages were substantial. Thus, we are not left with a definite and firm conviction that the judge committed a mistake when he found SolmeteX failed to establish a claim under G. L. c. 93A, §§ 2 and 11.
c. Breach of contract. Lastly, SolmeteX argues that the judge committed clear error when he rejected the claim that Enpress breached a contract with Boyd by failing to pay him a royalty in exchange for the assignment of inventor's rights that he executed during the course of his consulting work on the AVTMax (inventor's assignment).[15] SolmeteX further argues that, due to what it terms a lack of consideration, the judge should have voided the inventor's assignment altogether. SolmeteX maintains that it has the right to pursue this claim as a result of an assignment of intellectual property rights that Boyd made in favor of SolmeteX as part of the aforementioned settlement related to this litigation. Even assuming that to be true,[16] however, there was no evidence that Enpress and Boyd ever entered into a contract whereby Enpress agreed to pay a royalty in exchange for the inventor's assignment, never mind that it breached such a contract.[17] Once again, therefore, we have not been left with a definite and firm conviction that a mistake was committed.
5. Fees and costs. Dube and Enpress both seek sanctions against SolmeteX pursuant to Mass.R.A.P. 25, as appearing in 376 Mass. 949 (1979), which allows this court "to award double costs to an appellee in a civil case when the appeal is frivolous, immaterial, or intended for delay." Avery v. Steele, 414 Mass. 450, 455 (1993). "An appeal is frivolous when the law is well settled, when there can be no reasonable expectation of reversal." Ibid. While we have found SolmeteX's arguments unpersuasive, "[w]e are hesitant to deem an appeal frivolous and grant sanctions except in egregious cases." See Symmons v. O'Keefe, 419 Mass. 288, 303 (1995). This is not such a case.
Corrected amended judgment dated May 2, 2017, affirmed.

Apavia, LLC, a division of Enpress, also is a named defendant. We refer to them collectively as "Enpress."

The effective judgment in this appeal is the corrected amended judgment entered on May 2, 2017.

Mercury, at certain levels, is considered a hazardous waste for purposes of disposal.

On the eve of trial, SolmeteX abandoned the claims that it had asserted, and litigated for several years, against Dube and Enpress for the misappropriation of trade secrets.

In an effort to destroy evidence of his communications with Enpress, Dube did use an available software program to "clean" his work laptop personal computer.

SolmeteX itself has surreptitiously purchased amalgam separators from its competitors for the purpose of analyzing the technology.

None of the parties pursued posttrial motions relative to the jury verdicts.

It is not clear why the jury included the cost of two canisters in the award, but "an element of uncertainty in their assessment is not a bar to recovery." Carlo Bianchi & Co. v. Builders' Equip. & Supplies Co., 347 Mass. 636, 646 (1964) (citation and quotation omitted).

Dube and Enpress also argue that the duty of loyalty claims must fail because all of the alleged wrongdoing occurred before the SolmeteX business was purchased by its current owners, as explained further below. However, SolmeteX, LLC, secured a "confirmatory assignment" from the prior owner, which, while not a model of clarity, appears to cover the claims at issue.

The judge, over the objection of Enpress, never used the words "but for," though that was the gist of the instruction he provided on causation.

The SolmeteX business had three different owners while Dube was employed there, having first been sold by Boyd's group to Layne Christensen Company, and then to the group led by Gemini.

"The elements of fraud consist of (1) a false representation (2) of a matter of material fact (3) with knowledge of its falsity (4) for the purpose of inducing action thereon, and (5) that the plaintiff relied upon the representation as true and acted upon it to his or her damage." Balles v. Babcock Power Inc., 476 Mass. 565, 573-574 (2017).

Enpress sought patent protection relative to the AVTMax and, as a courtesy, listed Boyd as one of the inventors on the application. Boyd, for his part, did not believe that he had any inventor's rights.

While the assignment of intellectual property rights from Boyd to SolmeteX is written in broad terms, it makes no mention of either the existence or assignment of such a claim for breach of contract.

Enpress and Boyd attempted to negotiate an agreement whereby Enpress would pay Boyd a royalty for his consulting work in connection with the AVTMax. The agreement was never finalized, but Enpress did pay Boyd for that consulting work at the rate of $10,000 per month for approximately seven months.