**June A. TAYLOR, Individually and as Administratrix of the Estate of Claude H. Taylor, et al., Plaintiffs**

v.

**AIRCO, INC., et al., Defendants.**

**C.A. No. 02–30014–MAP.**

United States District Court,
D. Massachusetts.

Aug. 29, 2007.

Keith A. Minoff, David S. Lawless, Robinson Donovan, P.C., Springfield, MA, Ron Simon, Simon & Associates, Washington, DC, for Plaintiffs.

Andrea B. Daloia, Thompson Hine LLP, William Gorenc, Jr., Wegman, Hessler & Vanderbug, Heidi B. Goldstein, Thomas L. Feher, Thompson Hine LLP, Cleveland, OH, William A. Staar, Morrison, Mahoney, & Miller LLP, Joseph L. Kociubes, Mary B. Murrane, Bingham McCutchen LLP, Joseph J. Leghorn, J. Christopher Allen, Jr., Nixon Peabody, LLP, Mark S. Granger, Morrison Mahoney LLP, Brian D. Gross, John B. Manning, Cooley, Manion & Jones, LLP, Christopher M. Tauro, Lawrence G. Cetrulo, Cetrulo & Capone LLP, Boston, MA, Michael Moon, Jr., William E. Padgett, Barnes & Thornburg, Indianapolis, IN, Samuel Goldblatt, Nixon Peabody LLP, Buffalo, NY, Robert M. Mack, Morrison, Mahoney & Miller, Springfield, MA, Timothy J. Coughlin, Thompson Hine LLP, Clearwater, OH, Gail C. Ford, Vorys, Sater, Seymour and Pease, LLP, Columbus, OH, Carmen R. Toledo, Elizabeth Semancik White, W. Ray Persons, King & Spalding LLP, Atlanta, GA, Cynthia A. Stroman, King & Spalding, Washington, DC, for Defendants.

### MEMORANDUM REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON FAILURE TO WARN, FRAUD, AND CIVIL CONSPIRACY CLAIMS

### (Dkt. Nos. 542, 561, 572, 606, 607, 616, and 623)

PONSOR, District Judge.

Charles B. Cappel, Baggett, McCall, Burgess, Watson & Gaughan, Wells T. Watson, William B. Baggett, Baggett, McCall, Burgess & Watson, Lake Charles, LA, Herschel L. Hobson, The Law Office of Herschel L. Hobson, Beaumont, TX,

## I. INTRODUCTION

On January 31, 2002, the family of Claude Taylor filed this toxic tort lawsuit against thirty-nine Defendants. Today, only ten Defendants remain: The Ameri-

can Chemistry Council, Borden, Inc., Conoco, Inc., The Dow Chemical Company ("Dow"), Gencorp (a/k/a General Tire and Rubber Company), Goodrich Corporation, Goodyear Tire and Rubber Company, Honeywell International, Inc., Olin Corporation, and Union Carbide Corporation ("UCC"). These Defendants have filed numerous motions for summary judgment. The court earlier this year denied Defendants' motion for summary judgment arguing an absence of sufficient evidence of medical causation.

Before the court now are Defendants' additional motions seeking judgment based on new arguments directed at all the remaining claims, specifically failure to warn, fraud, and civil conspiracy. For the reasons set forth below, the court will allow Defendants' motions on all Plaintiffs' theories and will direct the clerk to enter judgment for all the Defendants still in the case.

The essence of this lengthy memorandum may be briefly summarized as follows. Plaintiffs' decedent's employer, Monsanto, was a highly sophisticated user and manufacturer of vinyl chloride. As a matter of law, any obligation to warn an employee such as Claude Taylor of the dangers of this substance fell on Monsanto, not on Defendants. Moreover, the argument that Defendants participated in some fraud, or in a conspiracy with Monsanto, based on the publication of an industry pamphlet or any other general industry behavior related to vinyl chloride, is both flawed as a matter of law and factually unsustainable on the record of this case.

It is never an easy decision to render judgment without trial where family members have suffered the tragedy of losing a loved one, especially when the litigation has gone on as long as this has. The court is convinced, however, that it would be unfair to Plaintiffs, as well as Defendants, to pretend that the remaining claims possess an adequate legal and factual basis. They do not, and it would be an unkindness to all the parties to hold otherwise.

## II. FACTS

### A. Plaintiffs' Decedent.

Claude Taylor began work at the Monsanto Indian Orchard Facility in Springfield, Massachusetts in July 1953 as a pressman. Sometime in the second half of 1954, he was assigned to a new department as a Vinyl Chloride ("VC") polymerization worker. From 1954 until 1959, Claude Taylor worked as a process helper and a spray dryer operator. From 1959 until 1975, he worked as a kettle operator and control kettle operator. All these jobs required exposure to high levels of VC. From 1954 to 1975, Claude Taylor worked in Buildings 88 and 92 where Monsanto housed its suspension VC polymerization operations, which produced a PVC resin end-product.

On March 20, 2000, Taylor was diagnosed with inoperable intrahepatic cholangiocarcinoma. He died on October 30, 2000, seven months after his diagnosis. Plaintiffs have alleged that Defendants supplied VC to the Indian Orchard plant, which led to Claude Taylor's exposure to a carcinogenic substance. It is, moreover, Plaintiffs' position that Defendants defrauded Taylor by concealing and misrepresenting the risks of exposure to VC, and failed to provide adequate warnings of those very same risks. Plaintiffs further claim that Defendants conspired to conceal and misrepresent these risks.

Claude Taylor's employer Monsanto, which is no longer a party to this action, began manufacturing VC in its Texas facility in 1952. Monsanto was a large, diversified company primarily engaged in the manufacture and sale of a varied line of

products derived from petroleum, natural gas, and phosphate ore.[1] From 1954 to 1968, the majority of VC shipped to the Indian Orchard facility was supplied by Monsanto. Monsanto always had a back-up supplier in case of a failure at its Texas facility. Dow became Monsanto's principal supplier in 1968, when the Texas facility was closed.

### B. The Chemical Safety Data Sheet for Vinyl Chloride, SD–56.

The individual Defendants, including Claude Taylor's employer Monsanto, were members of the Manufacturing Chemists' Association (now known as The American Chemistry Council) ("MCA").[2] In February, 1954, the MCA published the Chemical Safety Data Sheet SD–56, a twenty-page document which collected the "best current opinions" regarding the "safe handling and use of Vinyl Chloride" ("SD–56").[3] SD–56 was one of a series of chemical data sheets published and sold by the MCA. SD–56 stated, among other things, that "[t]he concentration of vinyl chloride should be kept below the upper safe limit

of 500 ppm at all times" in "work areas where vinyl chloride is handled or stored."

In the late 1950s, Dow conducted a toxicological study in which laboratory rats, dogs, rabbits and guinea pigs were exposed to levels of VC ranging from 50 ppm to 500 ppm for several hours a day over the course of several months. Dow scientists observed: (1) a statistically significant increased incidence of elevated liver weights among male rats exposed to 500 ppm of VC; (2) micropathological degeneration of liver tissue among rabbits exposed to 200 ppm of VC; (3) a non-statistically significant increased incidence of liver weights among male rats exposed to 200 ppm of VC; and (4) increased liver weights among rats exposed to 100 ppm of VC. Torkelson, et al., "The Toxicity of Vinyl Chloride as Determined by Repeated Exposure of Laboratory Animals," *American Industrial Hygiene Association Journal*, Vol. 22, No. 5 (October 1961) ("Torkelson study").[4] With regard to this study, Dow's V.K. Rowe stated in a letter to a fellow researcher at Dow in 1959 that based on this study, regular exposure to VC at 500

1. In 1971, Monsanto's PVC estimated production capacity ranked tenth out of 23 PVC producers in the United States. In 1972, Monsanto realized total net sales of $2.647 billion. Monsanto's polymers and petrochemical operations realized sales of $539.5 million. Monsanto employed 58,000 employees and operated 39 plants in 15 countries world-wide.

2. Monsanto, along with all the other individual Defendants, was privy to information made available to MCA members regarding possible health risks arising from use or exposure to VC. From approximately 1959 to approximately 1961, Monsanto's Dr. R.E. Kelly served as Chairman of the MCA's Medical Advisory Committee.

3. On October 2, 1953, the MCA sent a final draft of SD–56 to "producers and users" of vinyl chloride "who had received copies of the previous draft in the hope that those para-

graphs on which they had commented might be re-examined, and if necessary, deleted or corrected."

4. The Dow toxicology study and Dow's recommendation with respect to a reduction of the recommended exposure levels were published later that year in the *American Industrial Hygiene Association Journal* in an article entitled, "The Toxicity of Vinyl Chloride as Determined by Repeated Exposure of Laboratory Animals." At about that time, Dow adopted the 50 ppm TLV as a guide for its operations. Plaintiffs assert that only Monsanto scientists were aware of this article, and that no one at the Indian Orchard plant was made aware of this development. In 1962, following the publication of the Torkelson Article, a committee of the American Conference of Governmental Industrial Hygienists (the "TLV Committee") considered a reduction in the recommended exposure level to adopt the Dow recommendation.

ppm "is going to produce rather appreciable injury." (Dkt. No. 558, Ex. O.)

In May, 1961, Dr. Torkelson presented data from this study at the annual meeting of the American Industrial Hygiene Association ("AIHA"). Dr. Torkelson advised the AIHA members, including Monsanto, that Dow recommended that VC exposure levels be reduced to 50 ppm and subject to a ceiling level of 100 ppm.

In 1963, at the annual meeting of the American Conference of Governmental Industrial Hygienists ("ACGIH"), the members decided to maintain the 500 ppm exposure limit after weighing all of the scientific evidence. In February, 1965, Monsanto issued a standard procedure formally adopting 500 ppm as the threshold limit value for workplace exposure to VC at its Indian Orchard plant. In 1966, the ACGIH published a revised edition of its "Documentation on Threshold Limit Values." The publication indicated that key studies on VC at that time showed that the principal pathological changes associated with VC exposure included liver abnormalities. In 1968, Dow conducted a monitoring study and presented the results at several conferences, reporting that abnormal liver function tests were observed in Dow workers exposed to greater than 200 ppm VC. In April, 1970, the ACGIH TLV Committee recommended reducing the VC threshold limit value to 200 ppm partly in response to Dow's monitoring study.

During the 1960s, a possible link between VC exposure and a degenerative hand condition known as acroosteolysis was also identified, first observed among B.F. Goodrich PVC workers. Throughout the mid–1960s, researchers (including Monsanto's medical director) studied and discussed the potential occupational hazard. The final results of a study were published in January 1971 in *Archives of Environmental Health*, a publication of the American Medical Association. Based on this study, it was believed that workers, whose duties did not include direct exposure through hand-cleaning of the kettles, were not at risk from VC.

On January 26–27, 1970, members of the MCA Safety and Protection Committee met in New York, New York and discussed revising the chemical safety data sheets relating to VC. The group decided against revising the informational material to reflect a lower ppm exposure level.

In March 1970, an Italian doctor named Pierluigi Viola published a report entitled "Pathology of Vinyl Chloride" in *Medicina del Lavoro*, an Italian journal.[5] Dr. Viola observed that rats exposed to 30,000 ppm of VC for four hours per day, five days per week over a twelve-month period "show[ed] degeneration of the skeleton and connective tissue with histopathological pictures similar to those observed in human AOL of the hands." Dr. Viola concluded, however, that "no implication to human pathology [could] be extrapolated" from his study.

In September, 1970, an Occupational Health Committee meeting took place among producers of PVC/VC in Montreal, Canada. The participants discussed Dr. Viola's report at the International Cancer Congress and agreed to recommend that the MCA sponsor research regarding the carcinogenicity of VC. In May, 1971, the MCA invited Dr. Viola to Washington to further discuss his study. As a result, in

5. Dr. Viola also published the results reported at the International Cancer Congress in May, 1971 in *Cancer Research* 31, 516–22, "Oncogenic Response in Rat Skin, Lungs and Bones to Vinyl Chloride." The study's findings were first disclosed in 1969 at the XVI International Congress on Occupational Health in Japan.

November, 1971, MCA representatives recommended protocols for further research to be sponsored by industry representatives.[6] At the November, 1971, meeting, W.E. McCormick made the statement that "If Viola's work is substantiated, it could mean the absolute end of the PVC industry in America." (Dkt. No. 587, Ex. U.)

In December, 1971 and March, 1972, members of the MCA Ad Hoc Planning Group for Vinyl Chloride Research, including Monsanto's Dr. Johnson, met in Washington, D.C. The committee discussed, among other things, protocols for future animal studies and the need for an epidemiological study among workers exposed to VC. (See Dkt. No. 587, Ex. U ("There was general agreement that an epidemiological study of exposed workers would have to be attempted before long.")) The planning group concurred on the following concerns, among others, that should guide any decisions made on research protocols or other program elements: "(b) The need to be able to assure the employees of the industry that management was concerned for, and diligent in seeking the information necessary, to protect their health. (c) The need to develop data useful in defense of the industry against invalid claims for injury for alleged occupational or community exposure." (Dkt. No. 587, Ex. V.) In April 1972, members of the MCA met in Washington, D.C. The participants agreed to approve the animal testing protocols developed by the Ad Hoc Planning Group for Vinyl Chloride Research.

In late 1971, MCA member companies became aware that additional animal studies relating to vinyl chloride were being conducted in Europe. After signing a confidentiality agreement (sometimes referred to as a "secrecy agreement") with European manufacturers, agreeing to not publicize the results of the Professor Cesare Maltoni study, MCA members were invited to attend a presentation in Bologna, Italy on January 17, 1973. At the meeting, Professor Cesare Maltoni of the University of Bologna presented the results of animal studies he had conducted. He reported finding tumors in rats at concentrations of VC as low as 250 ppm. He also reported finding angiosarcoma of the liver ("ASL"), an extremely rare form of cancer, in one of the sixty rats exposed to 250 ppm. No tumors appeared in rats exposed to 50 ppm.

In a March 5, 1973 Confidential Memorandum, Dow suggested that the findings protected under the "secrecy agreement" should be disclosed to the government for the following reasons:

1. It would be extremely damaging to the chemical industry reputation if someone should discover that we have this information and have not disclosed it to the Government.

2. We must obtain data to refute, or explain the European data. Participation by the Government in designing the tests will commit them to the results. If we proceed with testing solely by the industry chances are that the Government will recommend that further testing should be done.

(Dkt. No. 587, Ex. AA.)

It was not until 1972 that the MCA published a revised SD–56. The revisions provided, in part:

6. In an interoffice memorandum, UCC's R.N. Wheeler, Jr., stated: "Publishing of Doctor Viola's work in the U.S. could lead to serious problems with regard to the vinyl chloride monomer and resin industry.... The present political climate in the U.S. is such that a campaign by Mr. R. Nader and others could force an industrial upheaval via new laws or strict interpretation of pollution and occupations health laws." (Dkt. No. 587, Ex. Y.)

The primary hazard of vinyl chloride is associated with excessive respiratory exposure. Exposure to high levels may produce some lung irritation. Chronic overexposure may produce liver injury . . .

The lowest concentration of VC at which its odor can be detected is reported to be 260 ppm.

VC does not present a serious industrial health hazard provided workers are adequately supervised and observe the proper means of handling it.

Under the Occupational Safety and Health Act, the U.S. Department of Labor has set a 500 ppm Ceiling Value on permitted employee exposures.

Based upon animal and human observations, this level provides considerable margin of safety for industrial exposures.

NOTE: A syndrome termed occupational AOL, characterized primarily by Raynaud's phenomenon and osteolytic changes in certain bones, particularly the distal phalanges of the hands, has been noted among certain workers in vinyl chloride polymerization operations. The specific cause of this disease, and particularly any role played by vinyl chloride is unknown.

Recent research studies reported from Italy indicate that repeated, long-term high level exposures of rats to VC can result in the development of malignant tumors. However, many years of industrial experience with human exposures to concentrations frequently far above current standards have not demonstrated any carcinogenicity to humans.

Dow added the following wording to the cover of the 1972 SD–56, "The American Conference of Governmental Industrial Hygienists evaluated the most recent available industrial experience and toxicity data for vinyl chloride and revised the TLV from 500 ppm to 200 ppm. The Dow Chemical Company has an allowable time weighted average for industrial exposure to vinyl chloride of 50 ppm."

On January 30, 1973, members of the MCA held a meeting in Washington, D.C. The participants discussed, among other things, inquiries regarding "probable changes in the Threshold Limit Value for vinyl chloride." The meeting's minutes provided as follows:

[T]here was general agreement that specific inquiries should be answered with a frank statement that available literature data suggests that an early and significant reduction from the present 200 ppm standard could be anticipated and that industrial hygiene planning should be designed to keep exposures to a minimum. Each company will have to exercise its individual judgment as to the time and level of future standards its customers may be told to anticipate.

In or around June 1973, the MCA formally engaged Tabershaw–Cooper Associates to conduct an epidemiological study among VC/PVC workers.

On July 17, 1973, representatives of the MCA conducted a meeting with the National Institute for Occupational Safety and Health ("NIOSH") in Rockville, Maryland. The MCA representatives provided NIOSH with information concerning the results of toxicology studies conducted in Europe, including Dr. Viola's research and Dr. Maltoni's observation of tumors in rats exposed to 250 ppm of VC.

On January 16, 1974, Dr. Maurice Johnson of B.F. Goodrich informed Monsanto's Dr. Kelly that B.F. Goodrich had discovered two workers at its Louisville plant who had been exposed to VC and who had "definite microscopic pathology of angio

sacormas [sic] of the liver." [7]

Prior to 1974, government regulations relating to occupational exposure to VC set the permissible exposure level at 500 ppm. On January 23, 1974, after B.F. Goodrich notified NIOSH of the apparent connection between VC exposure and human ASL, NIOSH advised the United States Occupational Safety and Health Administration ("OSHA") of this possible association. After lengthy research and several temporary measures, on October 4, 1974, OSHA adopted an exposure standard for VC based on a hearing record exceeding 4,000 pages, noting that employees had been invited to submit information and had made their views known to OSHA. OSHA set a VC exposure limit of 1 ppm averaged over any eight-hour period and a ceiling of 5 ppm averaged over any period exceeding 15 minutes, and required personal or area monitoring of employee VC exposure under certain conditions.

It bears noting that it was not until OSHA regulations were changed that Monsanto reduced the TLV to 50 ppm. Monsanto, exercising its own independent judgment, employed a 500 ppm TLV for its workers engaged in VC and PVC production, including at the Indian Orchard plant, from 1965 until 1974. Monsanto, along with many of Defendant companies, attended most MCA meetings, or was promptly provided with minutes of the meetings, and was kept abreast of any developments in the epidemiological research.

## C. VC Deliveries to Monsanto.

From 1961 through 1968, Monsanto's Texas facility produced on average 114 million pounds of VC annually. Monsanto used most of this VC at the Indian Orchard plant.

VC is a gas at ordinary temperatures. As part of its PVC polymerization operations at Indian Orchard, Monsanto used liquefied VC. To be liquefied, VC must be either pressurized or refrigerated. VC was delivered in bulk to the Indian Orchard plant in liquid form in pressurized railroad tank cars. Monsanto received, unloaded, and stored VC at the Indian Orchard plant's "tank farm" located on the South Plot of the Indian Orchard plant within three hundred yards of the buildings where PVC polymerization activities were taking place.

The tank farm contained six sealed and pressurized outdoor storage tanks with capacities ranging from 10,000 to 30,000 gallons. These tanks were connected by pipe to the buildings where PVC production took place. Any VC delivered to the Indian Orchard plant was mixed in the feed tank at the facility. Claude Taylor's duties confined him to the PVC polymerization department working around the "kettles." In other words, the VC deliveries were not made within the parameters of Buildings 88 and 92, where Taylor worked and where he might have seen Defendants' tank cars containing VC.

## D. Access to SD–56 at Monsanto.

The Monsanto "Standard Operating Procedures Manual" (the "Manual") at the Indian Orchard plant closely tracked the language of SD–56. The Manual provided that "[a]side from the risk of fire and explosion, vinyl chloride presents no other serious problem in general handling. The threshold limit value is 500 ppm." (Dkt.

---

**7.** Plaintiffs have asserted that the connection between the deaths of B.F. Goodrich plant workers and VC exposure would have come to light much earlier had Dr. Creech, who analyzed the ASL pathology at B.F. Goodrich, been informed of the European findings at the time they became available.

No. 704, Ex. I.) The only hazards Indian Orchard personnel were aware of were fire, explosion, freezing of the skin, disorientation, loss of consciousness and asphyxiation (from acute exposure to high concentrations of VC vapor).

The Manual was available in the building where Claude Taylor and other kettle operators worked. The following are highlights from deposition testimony of former Monsanto employees about access to and availability of SD–56, as well as access to and availability of Monsanto's own Operations Procedures Manual.

Bruce Eley, a Monsanto Certified Industrial Hygienist, testified that since he began his employment in 1969, a version of SD–56 dated February 1954, "was widely relied upon through industry for information on the safe handling of vinyl chloride." (Dkt. No. 704, Ex. K, Affidavit of Bruce Eley at ¶ 1.) As to Monsanto specifically, Eley testified that "Monsanto used the Chemical Safety Data Series including the one on vinyl chloride in its manufacturing operations as a resource, information resource." (Dkt. No. 704, Ex. L, Deposition of Bruce Eley 19.) Eley further stated that "the 1954 version of SD–56 that was in effect in 1969 did not identify any health effects of chronic exposure to vinyl chloride and did not indicate that vinyl chloride exposure may cause any type of cancer, since that knowledge was not had in 1954." (Eley Aff. at ¶ 3.)

James Shriver, one of three supervisors in the PVC polymerization department where Claude Taylor worked, testified that he saw SD–56 "many times during the course of [his] supervisory and engineering. [He] was trained on this document." (Dkt. No. 704, Ex. A, James Shriver Deposition at 44.) He acknowledged that SD–56 essentially served as a guide for using VC. According to Shriver, SD–56 was "part of the operating procedures for the process ... the operating procedures were obviously available and utilized by the employees who were working with the process." (*Id.* at 45.) He could not remember exactly where SD–56 was made available, but he testified that "the employees were trained based on this document and others." (*Id.*) Shriver's testimony indicated that employees were trained and often referred to the Operations Manual which was made available to all kettle operators in their working area.

David Gendron, a Process Engineer in the Process Technology department, became manufacturing department supervisor in Building 88, where Claude Taylor worked. Gendron recalled relying on Monsanto's Safety Manual. Copies were "located on the operator's desk in the operating area in a book that was marked standard procedures." (Dkt. No. 704, Ex. N, Deposition of David Gendron at 51.) Workers were trained when they came on the job by the "foreman to refer to those procedures for all their questions, at least the first round of questions about operating details and safety issues." (*Id.*) Gendron also acknowledged that the "standard procedures book" contained a "material handling section that listed each of the chemicals used in the formulation and described the hazards associated with each one and the protective measures required." (*Id.* at 53.)

## III. DISCUSSION

### A. Failure to Warn Claim.

Counts I–IV are essentially negligence and breach of warranty claims against the three manufacturer/supplier Defendants, Dow, Goodrich, and UCC. Grouped with these counts is Count X under Mass. Gen. Laws ch. 93A.

During oral argument on May 29, 2007, some confusion arose regarding the pre-

cise nature of these counts. Plaintiffs argued that these counts charged not only a failure to warn, but also an "unreasonably dangerous" product claim. In their latest submissions, however, Plaintiffs concede that these counts charge only a failure to warn on part of the manufacturer Defendants. No claim is offered against these Defendants, or any others remaining in the case, charging manufacture or distribution of an unreasonably dangerous product.

 With regard to the failure to warn claim, Defendants seek summary judgment on the basis of the "sophisticated user" defense. This doctrine relieves a manufacturer of liability for failing to warn of a product's latent characteristics or dangers when "the end user knows or reasonably should know of a product's dangers." *Carrel v. National Cord & Braid Corp.*, 447 Mass. 431, 440–441, 852 N.E.2d 100 (2006) (*citing Hoffman v. Houghton Chem. Corp.*, 434 Mass. 624, 630, 751 N.E.2d 848 (2001)). The doctrine is a separate and "conceptually discrete affirmative defense" from the "bulk supplier" affirmative defense, but both "seek to advance the goal of products liability law to prevent accidents." *Id.* at 441, 852 N.E.2d 100. The "sophisticated user" doctrine "applies where a warning will have little deterrent effect," and it "allows the fact finder to determine that no such duty [to warn] was owed." *Id.* at 441, 852 N.E.2d 100 (citation omitted).

The doctrine is derived from the Restatement (Second) of Torts § 388 (1965)[8]. It is a corollary of the "open and obvious" doctrine, *Koken v. Black & Veatch Constr., Inc.*, 426 F.3d 39, 45–46 (1st Cir.2005), a theory that has been long recognized in Massachusetts as a defense in products liability cases grounded on a claim of failure to warn. *Carrel*, 447 Mass. at 441, 852 N.E.2d 100.

In *Carrel*, the court explicitly adopted the sophisticated user doctrine as a defense to claims of failure to warn. *Id.* The SJC recognized that usually, "the relevant inquiry turns on the end user's level of sophistication." *Id.* (citation omitted). In this case, the application of the doctrine pivots on the question of who was the relevant end user.

 Plaintiffs argue that Claude Taylor was the relevant user, and that there is no evidence that he possessed any level of sophistication regarding VC. *See Billsborrow v. Dow Chemical, U.S.A.*, 139 Misc.2d 488, 527 N.Y.S.2d 352 (N.Y.Sup.1988). Defendants, in turn, argue that Monsanto, Claude Taylor's employer, was the relevant user. *See Marques v. Bellofram Corp.*, 28 Mass.App.Ct. 277, 278–80, 550 N.E.2d 145 (1990) (where employee was injured using die casting machine, employer corporation considered to be user of product for purposes of comparing skill, knowledge, and experience level of user with that of supplier of machine); *Morgan v. Brush Wellman, Inc.*, 165 F.Supp.2d 704, 718 (E.D.Tenn.2001) (where employees of government contractors at nuclear armament were injured by exposure to beryllium oxide, United States government

---

**8.** The duties to warn are set forth in the Restatement (Second) of Torts § 388 (1965), which states:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel ... if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
(c) fails to exercise reasonable care to inform them of its dangerous condition or of facts which make it likely to be dangerous.

considered to be user of beryllium oxide for purposes of sophisticated user doctrine); *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552, 566 (W.D.Va.1984), aff'd sub nom., *Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985) (where employee contracted silicosis from on-the-job work with products containing silica, employer foundry's sophistication analyzed to determine supplier's duty to warn; employer in best and often only position adequately to warn and provide safety for employees).

The overwhelming weight of authority tilts strongly against any conclusion that Claude Taylor was the "end user" for purposes of the application of the defense asserted here. Monsanto was a sophisticated employer, who was in a superior position to issue directly all product-related warnings. Monsanto provided Operations Manuals to its workers containing safety warnings, supplied the bulk of VC to its Indian Orchard facility, and was fully as knowledgeable as (and probably more knowledgeable than) any of its subsidiary suppliers, of the risks of VC.

■ Given that Monsanto was the end user for purposes of the "sophisticated user" defense, the next question is whether the supplier Defendants were reasonable in relying on Monsanto to provide adequate warnings to Claude Taylor. "Where a seller or manufacturer has reason to believe that an employer would be acting to protect the safety of its employees, the seller may justifiably rely upon that fact." *Buettner v. R.W. Martin & Sons*, 47 F.3d 116, 120 (4th Cir.1995). An employer with sophisticated knowledge is in a better position to warn employees than is a bulk supplier of raw materials, since the supplier has no packages on which to place warnings to individual workers and lacks direct access to the employees to warn them adequately. *Id.*

■ The facts of record leave no possible dispute as to the reasonableness of Defendants' reliance on Monsanto to warn Claude Taylor. Monsanto was a large multinational corporation that manufactured and used millions of pounds of VC at the Indian Orchard plant alone. Monsanto had its own library of materials on the potential health effects of VC, and indeed had is own company-wide medical department and an occupational-medicine program dating to the 1930s. In addition, Monsanto's company-wide medical department included an epidemiologist. Monsanto was a member of the chemical industry trade group and participated in its research programs. Further, Monsanto conducted extensive training for its Orchard Plant employees, holding monthly safety meetings and posting safety information on plant bulletin boards. In short, Monsanto had access to precisely the same information as the supplier Defendants and was energetically engaged with its employees regarding the risks of VC.

Ample caselaw confirms that a supplier may reasonably rely on the employer when its experience and knowledge is substantial and equals the supplier's.[9] In *Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985), the court found the evidence that a foundry had extensive knowledge of the hazards associated with inhaling silica dust

---

**9.** The Fourth Circuit courts rely on comment "n" to the Restatement (Second) of Torts § 388. The test for reasonable reliance includes the following factors:
(1) the dangerous condition of the product;
(2) the purpose for which the product is used;
(3) the form of any warnings given;
(4) the reliability of the third party as a conduit of necessary information about the product;
(5) the magnitude of risk involved;
(6) the burdens imposed upon the supplier by requiring that he directly warn all users.

and the disease of silicosis, as well as proper dust control methods, negated a duty to warn foundry employees on part of the corporations which supplied the silica sand. *Id.* at 215; *see also Fisher v. Monsanto Co.,* 863 F.Supp. 285 (W.D.Va.1994) (court similarly found that the defendant supplier reasonably relied on the employer, who had "acquired its knowledge and expertise by developing the specifications for [the chemical], performing research and keeping abreast of public domain research . . ., participating in trade organizations, corresponding with [the defendant] and others, attending meetings, receiving various publications, and issuing its own publications."); *Smith v. Walter C. Best, Inc.,* 927 F.2d 736, 741 (3d Cir.1990) (court found it reasonable for the manufacturer to assume that the employer knew of the dangers of silica "given the state of common medical knowledge at all relevant times . . . and the fact that the employer was a member of the Industrial Health Foundation, a non-profit organization providing information to its members relative to occupations diseases and their prevention.").

The high level of Monsanto's knowledge and experience and the virtual impossibility of the suppliers warning Monsanto's employees directly is beyond fair dispute. Based on this the court must conclude as a matter of law that the supplier and manufacturer Defendants reasonably relied upon Monsanto to convey warnings to its workers, including Claude Taylor, of the risks of VC.

Plaintiffs argue that only a small handful of corporate executives at Monsanto had relevant knowledge and that as a result no one at the Indian Orchard plant knew or was intended to know the true dangers of the product to which employees were continuously exposed. No authority, however, requires suppliers to investigate the pre-

cise level of actual knowledge of middle-level managers before they may assert the "sophisticated user" affirmative defense. The undisputed fact is that Monsanto, as a manufacturer and an employer, was privy to the same level of expertise and knowledge as the suppliers. No more is required. Defendants Dow, Goodrich, and UCC (the only Defendants charged on these counts) are entitled to summary judgment on Counts I–IV and X.

### B. Fraud Claim.

In Count V, entitled "Deceit/Fraudulent Misrepresentation," Plaintiffs assert the following claims against all of the Defendants:

> The Manufacturer/Supplier Defendants knew and fraudulently concealed information that the decedent's exposure to their vinyl chloride products posed a greater risk to him of developing cancer or other disease, and failed to properly advise or inform the decedent of this danger.
>
> * * * *
>
> With the intent to deceive the government, the general public, and workers such as the decedent whose employment responsibilities exposed them to vinyl chloride, and with the intent that these persons and entities were, and should remain, ignorant of such medical and scientific data, and with the further intent to induce them to alter their position to injury and/or risk, and in order to gain an advantage, the Manufacturer/Supplier Defendants made material misrepresentations of fact, concealed material facts where they had a duty to disclose such facts, and presented as fact matters which they either knew to be false or knew could not be established as fact.

(Compl. ¶¶ 193, 195.)

Based on this language, Plaintiffs have offered fraud claims founded on both mis-

representation and fraudulent concealment. In essence, Plaintiffs contend that Defendants were responsible for the misleading contents of the MCA's Chemical Safety Data Sheet SD–56, which understated the risks of VC and which were then, somehow, conveyed to Claude Taylor. Plaintiffs argue that Defendants' collaborative efforts regarding the publication and dissemination of SD–56 perpetrated a fraud on Claude Taylor. Such an inference, however, simply does not flow from the facts in the record.

█ The individual contributions of MCA members made in collecting, organizing, and compiling the contents of SD–56 remain unknown. The mere existence of a trade association and the practice of the individual Defendants of sending representatives to scientific conferences and meetings does not constitute evidence that Defendants were responsible for the contents of SD–56.

Obviously, there is nothing inherently inappropriate in an industry-wide trade association or in conferences or meetings. *See Payton v. Abbott Labs,* 512 F.Supp. 1031, 1038 (D.Mass.1981). Indeed, these practices are common to most industries.

Even though the individual Defendants may have participated in drafting SD–56, no evidence of record indicates to what extent each Defendant controlled the contents of this twenty-page publication. *See McClure v. Owens Corning Fiberglas Corp.,* 188 Ill.2d 102, 150, 241 Ill.Dec. 787, 720 N.E.2d 242 (1999) ("To conclude that the content of the pamphlet demonstrates an agreement between these companies, therefore, is unreasonable.").

In fact, in *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), the Supreme Court explained:

Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.

*Id.* at 920, 102 S.Ct. 3409. *See In re Asbestos School Litigation Pfizer Inc. v. Giles,* 46 F.3d 1284, 1290 (3d Cir.1994) ("Thus, [the defendant] cannot be held civilly liable for any wrongful conduct committed by the [trade organization] or its members ... unless it can be shown that [the defendant's] actions taken in relation to the [organization] were specifically intended to further such wrongful conduct."). "A member of a trade group or other similar organization does not necessarily endorse everything done by that organization or its members." *In re Asbestos School Litigation,* 46 F.3d at 1290. Furthermore, "[a]ttendance at a meeting of an organization does not necessarily signify approval of *any* of that organization's activities. And, even if the attendance at issue here could reasonably be interpreted as an expression of general approval of the [organization's] goals, it unquestionably could not rationally be viewed as sufficient to show that [the defendant] specifically intended to further any allegedly tortious ... activities." *Id.* (emphasis in original). *See Claiborne Hardware,* 458 U.S. at 924, 102 S.Ct. 3409 ("Regular attendance and participation at the [meetings] ... is an insufficient predicate on which to impose liability [because the] ... findings do not suggest that any illegal conduct was authorized, ratified, or even discussed at any of the meetings.").

Given that Plaintiffs can do no more than offer evidence that individual Defendants sent representatives to meetings and conferences of the MCA, the record is

insufficient to permit any factfinder to conclude that Defendants were somehow responsible for SD–56.

 Even if evidence of responsibility on the part of the Defendants for SD–56 were sufficient, nothing in the record suggests that Claude Taylor ever saw, heard, or read that document. Although Plaintiffs allege that Claude Taylor heard representations "similar" to those contained in SD–56—namely, that exposure to VC at less than 500 ppm was safe—this is not equivalent to an allegation that Claude Taylor received or relied on SD–56 directly. *See Bogner v. Airco, Inc.*, No. 02–1157, 2003 WL 24121083 at * 4 n. 4 (C.D.Ill. Apr.1, 2003).

*Bogner* was a similar action filed by the family of a polymerization worker who was exposed to high levels of VC, alleging fraud and conspiracy against Goodrich Corporation and forty other named defendants. *Id.* at *1. Many of the *Bogner* complaint's allegations concern SD–56 and propound a theory of an alleged agreement to conceal the known dangers of VC through publication of the Material Safety Data Sheet. In *Bogner*, allegations included the availability of SD–56 throughout the plant and the repeated assurances of the safety of the work environment on the basis of SD–56. *Id.* at *4. The court found that "receiving or relying on information from an independent source that also happens to appear in SD–56 is not equivalent to receiving or relying on the information in SD–56 itself." *Id.* at *5. Similarly, if information conveyed to Claude Taylor came from a source other than SD–56, then the fact that SD–56 contained the same information is not sufficient to state a fraud claim against those generally responsible for its creation.

In sum, no reasonable jury could conclude on the facts of record either that Defendants were responsible for SD–56, or that Claude Taylor ever saw or relied on its contents. All of the remaining Defendants are entitled to summary judgment on Count V.

### C. *Conspiracy Claim.*

 In Count IX, Plaintiffs allege that all ten remaining Defendants conspired to conceal and misrepresent the risks of exposure to VC by disseminating SD–56 and by concealing and misrepresenting the findings of various studies and medical tests summarized above. One form of civil conspiracy recognized in the Restatement (Second) of Torts § 876(a) (1979), may in proper circumstances arise from "concerted action." Under this theory, liability may sometimes be imposed on one entity for the tort of another. *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir.1994). This version of "civil conspiracy" in Massachusetts is "more akin to a theory of common law joint liability in tort." *Id.*

Plaintiffs also offer a theory of liability for "aiding and abetting" based on Restatement (Second) of Torts § 876(b).[10] Section 876(b) states that an entity may be liable if it "knows that the . . . conduct [of another] constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."

 The first element of a claim under this theory is that a defendant give substantial assistance or encouragement to some other party with the knowledge that such assistance is contributing to a common tortious plan. *Payton*, 512 F.Supp. at 1035. In determining whether this element is satisfied, "the nature of the act

---

**10.** Although Plaintiffs note both § 876(a) and 876(b), they argue primarily for liability under § 876(b). No separate argument suggests independent liability under § 876(a).

encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind are all considered." Comment on Clause (b), Restatement § 876. There need not be an explicit agreement between the parties for this theory to apply. *Payton*, 512 F.Supp. at 1035 (citation omitted). However, a general awareness is not sufficient to show the level of knowledge that would give rise to liability for conspiracy. *Kyte v. Philip Morris Inc.*, 408 Mass. 162, 169, 556 N.E.2d 1025 (1990) (citations omitted) (no proof that the defendant cigarette manufacturer gave substantial assistance to a store's sale of cigarettes to minors or knew that the store's conduct constituted a breach of duty to minors purchasing cigarettes).

The Massachusetts Appeals Court has observed that "[i]n the tort field, the doctrine [imposing liability under § 876(b)] appears to be reserved for application to facts which manifest a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." *Stock v. Fife*, 13 Mass.App.Ct. 75, 82 n. 10, 430 N.E.2d 845 (1982) (despite a common plan among friends to drink alcohol while driving to and from a nightclub, no joint liability from the mere presence of the defendant in the car when the driver ran a red light and struck another vehicle).

The second element of a claim under § 876(b) is an unlawful intent. In other words, to be liable, a defendant must both actually encourage or support a tortious plan *and* intend that the underlying tort be committed. *See Robinson v. Bodoff*, 355 F.Supp.2d 578, 585 (D.Mass.2005) (a § 876 conspiracy claim requires "proof of intentional conduct (as opposed to negligence)").

Thus, in order to state a claim under § 876, Plaintiffs must prove an underlying *intended* tort. *Mass. Laborers' Health and Welfare Fund v. Philip Morris, Inc.*, 62 F.Supp.2d 236, 245 (D.Mass. 1999) (there can be no "joint liability for a tort unless there has been a tort, so the 'concerted action' version depends on proof of underlying tortious conduct for which liability can be assigned."). Plaintiffs rely on their fraud claim as a basis for liability. Since the court has found that Plaintiffs' fraud claim lacks merit, it therefore follows that the civil conspiracy claim must fail as well.

Plaintiffs, however, argue that the manufacturer Defendants may be liable under the "substantial assistance" theory of civil conspiracy. They argue that even if a defendant has not committed an underlying tort, so long as the co-conspirators knew their assistance was contributing to a common tortious plan, they are also liable for the conspiracy. Plaintiffs rely on Monsanto's alleged fraudulent misrepresentations to satisfy the requirement that there was an underlying intentional tort by the remaining Defendants. However, Plaintiffs must proffer "evidence of the defendants' knowledge of its substantial supporting role in an unlawful enterprise." *Kyte*, 408 Mass. at 168, 556 N.E.2d 1025. Because a conspiracy requires an agreement to commit a wrongful act, none can exist where an alleged participant lacks knowledge that a wrongful act is being perpetrated. *See Kyte*, 408 Mass. at 167–68, 556 N.E.2d 1025.

The record undisputably confirms Monsanto's exercise of independent judgment not only regarding the TLV limits set at its Indian Orchard facility, but also regarding any research it sponsored and any information it disseminated to its employees. Plaintiffs cannot point to any

evidence of record demonstrating knowledge on the part of Defendants regarding Monsanto's activities at Indian Orchard or the warnings given to its workers. Even viewing the evidence in the light most favorable to Plaintiffs, no reasonable jury could conclude that Defendants knowingly and intentionally participated in any civil conspiracy with Monsanto. All Defendants are therefore entitled to summary judgment on Count IX.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motions for Summary Judgment on Failure to Warn, Fraud, and Conspiracy (Dkt. Nos. 542, 561, 572, 606, 607, 616, and 623) are hereby ALLOWED.[11] These rulings dispose of all of Plaintiffs' remaining claims. The clerk will enter judgment for Defendants. The final pre-trial conference and trial, set for September 24 and October 15, are off. This case may now be closed.[12]

It is So Ordered.

---

**11.** Given Defendants' clear entitlement to summary judgment based on the arguments addressed, it is not necessary to discuss Defendants' alternate motions for summary judgment claiming de minimis or no exposure to VC (Dkt. No. 626).

**12.** In light of the court's rulings, any miscellaneous, remaining motions are hereby denied as moot.